BYBEE, Circuit Judge,
dissenting.
Roger Smith and Jacob Edmonds needed money. Bad. For an Anthrax concert. So they burglarized the Konzelmans’ garage to obtain tools. They then put bandannas on their faces to disguise themselves and made up code names. Smith took a rope into the house. One of them took a three-foot-long crowbar as well and savagely beat the Konzelmans with it, killing Mr. Konzelman and severely injuring Mrs. Konzelman. When Edmonds entered into a plea agreement and agreed to testify against Smith, Smith pled no contest to felony murder. Edmonds now claims that Smith did not kill Mr. Konzelman, and the majority, willing to believe him, thinks that Smith is innocent. The problem is that Smith was convicted of felony murder. Even accepting every word of Edmonds’s latest story as true— and there is good reason not to — it is entirely irrelevant that “Edmonds, and not Smith, was the killer,” or that “Smith did not kill Konzelman.” Maj. Op. at 814. Nonetheless, the majority, reviewing the record afresh and construing all evidence in favor of Smith, concludes that Smith is actually innocent because the evidence “would more likely than not lead any reasonable juror to believe that Smith was not guilty of the crime of felony murder.” Id. at 822.
My view of the majority’s analysis of the evidence can perhaps best be described by paraphrasing author Mary McCarthy: I disagree with nearly every word the majority has written, including “and” and “the.” My profound disagreement is not limited to the facts, but runs throughout the majority opinion. I cannot agree that the prosecution engaged in misconduct when it informed Edmonds, correctly, that he was exposing himself to criminal liability by making statements that Smith did not kill Mr. Konzelman. Even accepting, arguendo, that this did constitute prosecutorial misconduct, I see no justification for the presumption of truthfulness that the majority affords Edmonds’s affidavits. The majority’s newfound presumption is contrary tó our prior cases, all of which require that we remand to the district court for further findings as to the prosecution’s motives. Yet, all of this is largely a sideshow because even indulging the majority’s presumption, the evidence in this case is still insufficient to qualify Smith for Schlup v. Delo’s actual innocence gateway. See 513 U.S. 298, 314-15, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Indeed, in the thousands of habeas cases that have applied Schlup, I have been unable to locate a single case where a petitioner convicted of felony murder was able to establish actual innocence. Not one. And there is no basis for making this case the first. By all accounts, Smith was present, gloved, disguised, and armed with at least a rope when Mr. Konzelman was murdered in his home during the burglary. There isn’t a jury in the country that wouldn’t convict Smith today on a charge of felony murder. I therefore respectfully, but vigorously, dissent.
I. FACTS
In the early morning hours of April 3, 1989, after consuming methamphetamine, Roger Smith, Jacob Edmonds, and Marlin “Hooter” Bouse[1] decided to steal enough *830 money or property to purchase tickets to the Headbanger’s Ball in Portland the following night. The trio drove through various neighborhoods in Edmonds’s truck, looking for a good target. They ultimately seized on the residence of Emmett and Elma Konzelman because the garage door was open.
The trio parked Edmonds’s truck a few houses up the road from the Konzelmans’ home, and all three entered the garage to look for valuables. While the men were in the garage, Smith leaned into the doorway connecting the garage to the house. The door then slammed shut, and, scared that they had awoken any inhabitants, the three took off running. At this point, Bouse became separated from Edmonds and Smith. Bouse took a beer, a hat, and a pair of gloves from the garage and hid in the bushes near Edmonds’s truck. He did not see Edmonds and Smith again until forty-five minutes later, when they returned to the truck together.
The exact events that transpired in those forty-five minutes are subject to conflicting accounts and inferences. What is clear is that Edmonds and Smith burglarized the Konzelman residence during this time, and that one of the two men took a large crowbar from the Konzelman residence and savagely attacked the elderly Konzelmans in their bed, killing eightyseven-year-old Emmett and severely injuring seventy-four-year-old Elma.
According to Elma Konzelman, she awoke to find two men standing in her small bedroom. One was positioned in front of her dresser, while the other stood in the doorway for a short time before walking down the hallway. The man by the dresser told her to roll over, and she woke Emmett, who started to climb out of bed. The man by the dresser told Emmett to “Lay down, old man,” and when Emmett did not respond, the burglar proceeded to beat him with the crowbar. He then beat Mrs. Konzelman in the head with the crowbar[2] before resuming his bludgeoning of Mr. Konzelman.
Understandably, Elma Konzelman’s description of events is somewhat hazy. She could not recall at trial whether the lights were on or not, but stated that she could “see plainly.”[3] However, because both men used bandannas to mask their faces and wore hats, she was not able to describe either man very well. She testified that she initially thought that the man by the dresser was Emmett, who also owned a similarly lightcolored jacket, but on further reflection thought it more likely that she saw the inner liner of a short jacket worn inside out, as she could see the tags. She described his pants as dark[4] and his *831 hat as a “skull cap” or a “stocking cap.” She said that he was white, not very tall, “not exactly skinny, but not heavy,” and that he did not have long hair. She described him as rocking back and forth on the balls of his feet, as if he couldn’t stand still.[5] She did not remember seeing any gloves on the murderer’s hands. She could not describe the man in the doorway, who she said only stood there for a short time before leaving to resume ransacking her house. The second man also wore a bandanna over his face.
Mrs. Konzelman also remembered the attacker ripping out her phone lines after the attack to prevent her from calling the police, and that she heard a voice saying “Low” repeatedly.[6] Mrs. Konzelman said that she thought that the voice saying “Low” was not the voice of the man who attacked her, but that it was hard for her to be sure because he had only said that one word over and over.[7]
Smith has never given a detailed account of that evening on the record.[8] To quote the district court, however, he has “steadfastly denied hitting either victim with the crowbar, or even carrying the crowbar into the Konzelman home.” Smith wrote a letter to Elma Konzelman that was read during his sentencing. In this letter, he implicitly admitted his involvement in the burglary but maintained that he was not the killer, even though he could not remember certain parts of the evening. He also stated that Emmett Konzelman’s death was “a very violent and tremendous accident” that “never would have happened if it wasn’t for drugs.”
In contrast, Edmonds has given many accounts of that evening, which together encompass nearly every possible way that the burglary and murder might have occurred. Nonetheless, when considered in conjunction with the physical evidence recovered by the police and the testimony of the other witnesses, some things become clear. Both Smith and Edmonds were in the garage together before entering the house. There, they found two hats, and each put one on to disguise himself before entering the house. One burglar wore a baseball cap or a skull cap, while the other wore a floppier, fedora-type hat, with a brim running all the way around it. The men were also together when they both tied bandannas over their faces. Both burglars wore gloves, though it is not entirely clear who wore which gloves. Edmonds has stated that he wore a pair of white latex gloves, while Smith wore a pair of black leather gloves. However, evidence in the record also suggests that Smith wore a single brown work glove taken from the Konzelmans’ garage, and Smith asserts in his opening brief on ap *832 peal that he wore one or two such gloves.[9] In the garage, the pair found a crowbar and a rope. They brought both items into the house, with an eye toward possibly tying up the residents with the rope. According to affidavits from Smith’s two trial lawyers, Smith admitted to carrying the rope into the house. Police found the rope on the floor of the Konzelmans’ bedroom. The crowbar was found on the floor of the Konzelmans’ kitchen.
After leaving the Konzelman residence, Smith and Edmonds returned to the truck, where they rejoined Bouse. Edmonds drove the trio to Smith’s father’s house. Meanwhile, Elma Konzelman waited until she was sure that the burglars were gone before climbing out of her bed. When she realized that all of her phones had been disabled, she found her cane and carefully made her way next door to the neighbors’ house for help. The Konzelmans were rushed to the hospital. Mrs. Konzelman required surgery, including the implantation of a metal plate in her head, but she survived her injuries. Sadly, Mr. Konzelman was not as fortunate; he succumbed to his injuries sixteen hours later.
The trio was ultimately caught through a serendipitous convergence of good luck and sharp police work. While speaking with Edmonds about an unrelated offense, the police discovered that he had attended a particular Judas Priest concert in Seattle. A ticket stub from that same concert was found in the street about a block away from the Konzelmans’ on the morning after the burglary. After further investigation, the police confirmed that the ticket belonged to Edmonds. When confronted with this evidence, Edmonds admitted to his involvement with the burglary and identified Bouse and Smith as his companions that evening. Smith was charged with seven counts: aggravated murder, felony murder,[10] burglary, two counts of robbery, and two counts of assault.
Other evidence that corroborated Edmonds’s version of events,[11] Smith’s violent *833 history, and Edmonds’s apparent credibility[12] all pointed to Smith as the killer. While in custody, Edmonds also made statements to his cellmate Samuel Seaman consistent with the version of events Edmonds told the police. Ultimately, Edmonds was given a plea bargain contingent upon passing a polygraph examination. Although the results of the examination were inconclusive, the examiner’s opinion was that Edmonds was being truthful, and the state proceeded with the plea agreement. Meanwhile, Smith’s defense was under the impression that Edmonds had passed his polygraph examination. The defense requested a copy of Edmonds’s polygraph test results, but the prosecution, believing that the defense was not entitled to them because the prosecution could not introduce them as evidence, refused to produce them.
Faced with Edmonds’s testimony against him and the possibility of the death penalty if he proceeded to trial, Smith entered into a plea bargain. He pled no contest to felony murder and one count of robbery. In exchange, the state dropped the other five counts against him, including the capital crime of aggravated murder, as well as the charges pending against Smith’s girlfriend, Jeannie Simons. Smith received a life sentence, with a minimum term of 30 years. He appealed to the Oregon Court of Appeals and the Oregon Supreme Court without success.
Smith then sought post-conviction relief in state court, alleging violations of both his Sixth Amendment right to counsel and his due process rights. Smith’s petition was denied on its merits, as was his request for new counsel. On appeal, new counsel was appointed for Smith. However, on appeal, he argued only that his request for new counsel should have been granted at his first post-conviction hearing. He did not appeal the decision of the lower court on the merits. The Oregon Court of Appeals ruled against Smith and the Oregon Supreme Court denied review. Because Smith never presented his substantive post-conviction claims to the Oregon Supreme Court, he has not exhausted his state remedies.
Meanwhile, Edmonds was released from prison. He committed another crime and himself received a life sentence. Edmonds then sent the district attorney a short affidavit in which he recanted his testimony against Smith, declaring that Smith did not kill Mr. Konzelman and that Edmonds had knowingly committed perjury. Yet, at the same time, he maintained his innocence, stating that he had perjured himself out of fear that “Roger Smith was about to testify and leave me to do a life sentence for a crime I did not commit.”
Smith returned to state court to seek post-conviction relief based on Edmonds’s contradictory affidavit. The state court ruled against Smith, and he appealed. While this appeal was pending, he filed a motion with the state court requesting the voluntary dismissal of his appeal and the court granted his request.
Smith then sought federal post-conviction relief. During the course of these proceedings, Smith’s counsel obtained a second affidavit from Edmonds. This affidavit again stated that Smith did not kill Mr. Konzelman and that Edmonds had committed perjury. The affidavit also stated that Edmonds had not passed the polygraph test required by his plea bar *834 gain. Smith amended his petition by adding two additional claims. The first claim contended that his conviction violated his constitutional rights because he was actually innocent of felony murder. The second claim, based on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), derived from the prosecution’s failure to produce Edmonds’s polygraph test results when requested.
After the government saw Edmonds’s second affidavit, it arranged a meeting with Edmonds and his court-appointed counsel. There, the government informed Edmonds that if he persisted in testifying according to his affidavits, the state could have his plea agreement set aside. Without his plea agreement in place, Edmonds could be subject to capital murder charges for the killing of Emmett Konzelman. On the other hand, if Edmonds reaffirmed his prior testimony, which had identified Smith as the murder, the state would not pursue perjury charges against him based on the contents of his affidavits. After conferring with counsel, Edmonds decided to invoke his Fifth Amendment rights and refused to testify. In response, Smith argued that the prosecution had engaged in misconduct in order to prevent Edmonds from presenting exculpatory testimony. He sought a district court order compelling the prosecution to grant Edmonds use immunity under United States v. Westerdahl, 945 F.2d 1083 (9th Cir.1991).
The district court denied Smith’s petition on procedural grounds because he had failed to exhaust his state remedies, and his procedural default could not be excused because he had neither demonstrated actual innocence nor cause and prejudice. It rejected Smith’s claim of prosecutorial misconduct and denied his request for an evidentiary hearing. This appeal followed.
II. ANALYSIS
On post-conviction review under AED-PA, we “may not reach the merits of proeedurally defaulted claims.” Williams v. Stewart, 441 F.3d 1030, 1061 (9th Cir.2006); see also 28 U.S.C. § 2254(b) (2000). A claim is procedurally defaulted if “the petitioner failed to follow applicable state procedural rules in raising [it].” Sawyer v. Whitley, 505 U.S. 333, 338, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). However, “[f]ederal courts retain the authority to issue the writ of habeas corpus in a further, narrow class of cases despite a petitioner’s ... procedural default.” McCleskey v. Zant, 499 U.S. 467, 494, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). This narrow class of cases consists of those “extraordinary” cases where “a constitutional violation probably has caused the conviction of one innocent of the crime.” Id. In such a case, a “claim of innocencef ] ... is procedural, rather than substantive,” in that it allows a petitioner to overcome procedural hurdles so that a court will hear his actual substantive claim — that his constitutional rights were violated — on the merits. Schlup v. Delo, 513 U.S. 298, 314-15, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Such a “claim of innocence is thus ‘not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.’ ” Id. at 315, 115 S.Ct. 851 (citing Herrera v. Collins, 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993)).[13]
*835 Smith raises various constitutional claims arising from the actions of prosecutors and his own counsel prior to his entry of his plea of no contest. However, these claims are not before us because Smith has procedurally defaulted on these claims by failing to exhaust his remedies before the Oregon courts. The only way we may consider his claims at this time is if he can prove his actual innocence. Smith must show that, considering all the evidence now available, it is more likely than not that no reasonable juror would convict him of felony murder, the crime to which he pled no contest. See House v. Bell, — U.S. -, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006).
The majority gets Smith over these formidable procedural hurdles in three steps. First, the majority finds that the prosecution engaged in misconduct by preventing Edmonds from testifying on Smith’s behalf at his post-conviction proceedings by telling Edmonds that if he recanted his prior testimony, he would be in breach of his plea bargain and he could therefore be charged anew with the murder. The majority then decides — and it is the first court to even consider such a remedy, let alone to adopt it — that the remedy for this misconduct is to presume the truthfulness of Edmond’s recantation for the purposes of Smith’s actual innocence inquiry. By thus having assumed that Edmonds likely wielded the crowbar, the majority finds that no reasonable jury would have convicted Smith and that therefore he is actually innocent of felony murder. I disagree with the majority at each step.
A. Prosecutorial Misconduct
In general, a criminal defendant is not entitled to compel the government to grant immunity to a witness. United States v. Shirley, 884 F.2d 1130, 1133 (9th Cir.1989). In Westerdahl, 945 F.2d 1083, we held that while the decision to grant or withhold immunity is generally the exclusive domain of prosecutors, there is a limited exception under which a court can compel a grant of use immunity. Westerdahl’s exception applies when “the fact-finding process is intentionally distorted by prosecutorial misconduct, and the defendant is thereby denied a fair trial.” 945 F.2d at 1086. A defendant can make a prima facie case of prosecutorial misconduct by demonstrating that “the government distorted the judicial factfinding process by denying immunity to [a] potential [defense] witness” whose testimony would have been relevant. Id. “If a defendant makes an unrebutted prima facie showing of prosecutorial misconduct that could have prevented a defense witness from giving relevant testimony, we will remand the case to the district court to determine at an evidentiary hearing whether the government intentionally distorted the fact-finding process.” United States v. Whitehead, 200 F.3d 634, 640 (9th Cir.2000) (emphasis added) (quotation omitted); see also United States v. Tam, 240 F.3d 797, 804 n. 4 (9th Cir.2001) (same); Westerdahl, 945 F.2d at 1086, 1088 (same); United States v. Lord, 711 F.2d 887, 891 (9th Cir.1983) (same). Other circuits take a similar approach. See, e.g., United States v. Tarricone, 21 F.3d 474, 476-77 (2d Cir.1993) (remanding a prosecutorial misconduct claim for an evidentiary hearing to address questions of the government’s intent and knowledge); Kirkpatrick v. Whitley, 992 F.2d 491, 497-98 (5th Cir.1993) (same); Virgin Islands v. Smith, 615 F.2d 964, 969 (3d Cir.1980) (same). If, on remand, the *836 district court finds misconduct, then it can force the state to grant the defense witness use immunity.[14]
There is also a second line of cases which the majority opinion relies on. These cases stem from the Supreme Court’s decision in Webb v. Texas, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972), where the trial judge “gratuitously singled out ... one witness for a lengthy admonition on the dangers of perjury,” thereby implying “that he expected [the witness] to lie.” Id. at 97, 93 S.Ct. 351. The trial judge then proceeded “to assure him that if he lied, he would be prosecuted and probably convicted for perjury, that the sentence for that conviction would be added on to his present sentence, and that the result would be to impair his chances for parole.” Id. The witness subsequently refused to testify; the Court stated that the judge “effectively drove that witness off the stand.” Id. at 98, 93 S.Ct. 351. The Court held that, in doing so, the trial judge had denied the defendant the right to present his own witnesses, thus violating his Due Process rights under the Fourteenth Amendment. Id.
The majority relies heavily on a number of cases following Webb, such as Earp v. Ornoski, 431 F.3d 1158 (9th Cir.2005), and, in particular, United States v. Vavages, 151 F.3d 1185 (9th Cir.1998).[15] These cases hold that “substantial government interference with a defense witness’s free and unhampered choice to testify amounts to a violation of due process.” Vavages, 151 F.3d at 1188 (quotation omitted). If a defendant can establish both that the prosecution committed such a violation and that he suffered prejudice as a result, he is entitled to have his conviction vacated and to be retried. See, e.g., id. at 1188-93.
But, while both the Vavages and the Westerdahl lines of cases address prosecutorial misconduct, a petitioner who seeks relief under one line of cases presents a very different argument than a petitioner who seeks relief under the other. Vavages requires “substantial government interference with a defense witness’s free and unhampered choice to testify,” 151 F.3d at 1188, but Westerdahl requires something different; it requires a defendant to demonstrate that the “the fact-finding process [was] intentionally distorted by prosecutorial misconduct,” 945 F.2d at 1086. The biggest difference between these two standards is that Westerdahl has a more stringent prosecutorial intent requirement than Vavages does. This makes sense, as Westerdahl enables a defendant to compel the prosecution to grant immunity, a remedy that Vavages and its brethren do not provide. But here, Smith has opted not to seek relief under Vavages, and has only made an argument under Westerdahl. His opening and reply briefs do not cite to Vavages or to any other cases in its line. Nor does he argue that there was “substantial government interference with a defense witness’s free and unhampered choice to testify.” Instead, he narrowly focuses his attention on an argument under Westerdahl. The majority’s attempt to conjure a Vavages claim based on the argument that the cases “address[] the same basic issue,” Maj. Op. at 824-25 n. 30, is unconvincing. An argument that is not raised by a party in its opening brief is waived; accordingly, Smith has waived any Vavages argument he might make. See, *837 e.g., Smith v. Marsh, 194 F.3d 1045, 1052 (9th Cir.1999).
I do not agree with the majority’s decision to raise Vavages sua sponte, nor do I agree that this case falls within Vavages’s purview. Under Vavages, we examine the totality of the circumstances to determine whether the prosecution “substantially interfere[d]” with a witness’s right to decide whether to testify. “Among the factors courts consider ... are the manner in which the prosecutor or judge raises the issue, the language of the warnings, and the prosecutor’s ... basis in the record for believing the witness might lie.” Vavages, 151 F.3d at 1190. I address each in turn.
First, the manner in which the prosecutor raised the issue contradicts the majority’s assertion that the prosecutor was trying to interfere in Edmonds’s decision to testify or not. It was the prosecution, not the defense, who asked the court to appoint counsel for Edmonds. And the prosecution did not attempt to discuss Edmonds’s affidavits with him until after the court had provided him with counsel. If the prosecutor was driven by a desire to scare Edmonds into silence, it would have been much easier to do so if he was not represented by counsel. The only reason that the prosecutor would have wanted Edmonds to have legal counsel is if he wanted to ensure that Edmonds was fully informed of the consequences of his actions so that he could be prosecuted if he was, in fact, the murderer.[16] As in Vavages, “there is no question that the prosecutor was justified in ... cautioning [Edmonds’s counsel] against his client’s testifying falsely, and informing him of the possible consequences of [his] testimony.” Id. Thus, the manner in which the prosecutor raised the issue cuts against Smith. See also id. at 1191 (“The strongest factor in the government’s favor is that the prosecutor never directly admonished [the witness].”).
Second, the message itself was truthful and contained no more information than was necessary to communicate to Edmonds the implications of his change in testimony. Here, the message that the state would seek the death penalty against Edmonds if he testified that he, and not Smith, had killed Mr. Konzelman was, indisputably, a weighty statement, and if driven by an improper motive, would constitute prosecutorial misconduct of the highest order. See id. at 1190. But if Edmonds was lying, his testimony would be perjury that could potentially enable a convicted murderer to escape justice. Such a scenario would be sufficiently dire to merit such a stern warning.
Moreover, the prosecutor had very good reason to issue the warning to Edmonds. The state had previously entered into a plea agreement with Edmonds based on the premise that Smith, not Edmonds, had wielded the crowbar, and that Edmonds would so testify. If Edmonds recanted his testimony against Smith, he necessarily implicated himself and undermined the whole basis for his plea agreement. Under the circumstances — a vacillating, opportunistic witness — the state had every right, and perhaps even a duty, to advise Edmonds that his testimony imperiled his plea agreement and rendered him eligible for renewed charges. I suspect that we would not look favorably on a prosecutor who kept silent while a defendant violated his plea agreement and then declared him in breach and charged the defendant with the original offense.
*838 Finally, the prosecutor had ample “basis in the record for believing [that Edmonds] might lie.” Id. “[A] direct conflict between the witnesses] proposed testimony and[his] own prior testimony” constitutes a “substantial basis in the record for believing the witness might lie” which could justify “unusually strong admonitions against perjury.” Id. Here, Edmonds was offering a version of events that completely contradicted testimony that he had given on multiple occasions, multiple statements he had given to the police, and statements that he had made to a cellmate.
But the prosecution also had another reason to think that Edmonds was lying: After Edmonds was released for his role in the Konzelman burglary and murder, he committed another crime and was sentenced to life in prison.[17] Edmonds gave his affidavits while he was already in prison for this subsequent offense. It is quite plausible that Edmonds, believing that any testimony he gave would have no consequences for him, decided to lie in order to exculpate his old associate Smith.[18] The prosecution had good reason to believe that this was indeed the case; the second *839 affidavit was prepared and procured by Smith’s counsel in this proceeding.[19] This fact, when combined with Edmonds’s testimonial reversal, reveals that the prosecution had very strong grounds for believing that Edmonds’s testimony would be a lie. On balance, then, even if we consider Smith’s claim under Viwages — and I do not think that we should do so — I do not think that Smith can meet its requirements.
The majority takes a different view, and, without even considering the fact that Smith has not raised a Vavages argument, finds that Smith has met its requirements. The majority’s efforts to supplant Smith’s actual claim is necessary to its result because Smith cannot succeed on the Westerdahl argument that he has made. It is not at all clear on this record that the prosecution distorted the factfinding process, intentionally or otherwise. Nor did the district court agree with the majority’s view that prosecutors “threatened” Edmonds. The district court found that the prosecutor “warned Edmond[s]’s counsel that the district attorney would seek the death penalty if Edmonds testified that he, and not Smith, actually killed Emmet[t] Konzelman.” While there is arguably a fine line between warning of future consequences and threatening retribution, the distinction is critical to a determination of prosecutorial intent.
The record in this case presents a number of legitimate explanations for the prosecution’s conduct. As I have discussed above, the prosecution had unusually strong reasons to believe that Edmonds, who thought that any statements he made would be without consequences, was lying. Under these circumstances, advising Edmonds that there could be real consequences to his actions was not an act taken to “intentionally distort[]” the factfinding process, but instead was merely designed to prevent Edmonds from distorting the process. More importantly, as I discussed above, the prosecutor was giving Edmonds fair warning that his changed testimony would breach his plea agreement, which entailed serious consequences. The majority’s approach seems to leave prosecutors no appropriate course of action other than rolling over and permitting defendants to violate their plea bargain agreements with impunity.
Nor do I believe that we should conclude that the prosecution’s actions were unwarranted because, as the majority claims, the prosecution had previously “determined] in Smith’s case that an appropriate punishment for the actual killer was 30 years to life.” Maj. Op. at 824. First, we should use the sentence the prosecution sought to impose on Smith, rather than the sentence he actually received after his plea bargain, as the basis of any comparison. Smith was indicted for aggravated murder, which is a capital crime in Oregon, see Or. Rev. Stat. § 163.105(l)(a) (2003), and both Smith’s own affidavit and those of his trial attorneys identify his eligibility for the death penalty as a primary reason for his plea bargain. For that reason, I see no significance in the majority’s comparison. Second, unlike the majority, I cannot say that a prosecutor’s decision to vigorously pursue charges against a person who claims to have committed murder must necessarily be motivated by an improper desire to prevent that person from testifying. I think that it is at least equally plausible that such decisions are motivated *840 by an entirely proper impulse — a desire to bring that person to justice for his crimes.[20]
I am not suggesting that we should eviscerate Westerdahl by conclusively presuming that prosecutors always act with only the noblest of intentions when they make immunity decisions. Government malfeasance threatens the very legitimacy of our criminal justice system. Therefore, prosecutorial misconduct is an extremely serious charge that must be investigated carefully. But the question of the prosecution’s intent is a factual one, and must be resolved in each case by thoughtful and thorough consideration of the evidence. That task, we have sensibly held, should be undertaken by the district court. In Westerdahl cases, the defendant and the prosecution will often assert conflicting and contradictory versions of what happened and why. An appellate court, examining a cold and undeveloped record, is not the ideal institution for resolving such questions. Our precedent recognizes that an evidentiary hearing in the district court is a far superi- or mechanism. It is telling that in each of our Westerdahl cases, we have remanded to the district court for an evidentiary hearing. See, e.g., United States v. Young, 86 F.3d 944, 949 (9th Cir.1996) (remanding for an evidentiary hearing to determine whether the prosecutor withheld immunity from a defense witness in order to intentionally distort the factfinding process); Westerdahl, 945 F.2d at 1086 (same); Lord, 711 F.2d at 892-93 (same). The majority short-circuits this mechanism by avoiding the analysis required by a Westerdahl claim, and instead analyzing the case for a Vavages violation, which does not require the same showing of prosecutorial intent and the accompanying remand for an evidentiary hearing.
Thus, my problem with the majority’s conclusion goes far beyond the fact that it finds prosecutorial misconduct where I would find none. Far more important, the majority’s conclusion is premature. Instead of sifting through conflicting assertions with the aid of an undeveloped record, the majority should have followed our Westerdahl precedents and remanded this case to the district court for an evidentiary hearing on this question. The majority should not have deviated from our precedent by co-opting the Vavages line of cases and answering this question itself.
B. Remedy
Even if we could conclusively determine that there was prosecutorial misconduct here, I also take issue with the majority’s conclusion that the standard Westerdahl remedy for prosecutorial misconduct — ordering the prosecution to grant a defense witness use immunity — would be insufficient in this case. Maj. Op. at 825-27. The majority reasons that if Smith’s conviction is overturned as a result of Edmonds’s testimony, the prosecution could then charge Edmonds with murder and seek the death penalty. Id. Knowing this, the majority reasons, it is unreasonable to expect Edmonds to testify truthfully even if he is granted use immunity.[21] Id. The *841 majority declares that the issue of a remedy for Smith’s case presents a “novel procedural posture.” Maj. Op. at 826. However, this case is not novel. It presents a standard claim of prosecutorial misconduct under Westerdahl for which the remedy is clear, and clearly tied to the violation found. It is wholly inappropriate to treat this issue as open to fashioning new remedies when we are clearly bound by case law. However, this is what the majority does. Maj. Op. at 825-27. And after evaluating a series of proffered remedies,[22] the majority concludes that the appropriate response is to presume the truth of Edmonds’s affidavits for purposes of the Schlup inquiry. Id. at 827-28.
If ever there were affidavits that were entitled to a presumption of truthfulness, these surely are not they.[23] Edmonds has changed his testimony numerous times; at one point he even professed a version in which Smith’s girlfriend was their getaway driver.[24] Cf. Schlup, 513 U.S. at 324, 115 S.Ct. 851 (“To be credible, [an actual innocence] claim ... [must be supported by] new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial.” (emphasis added)). Similarly, the reason that we typically afford credibility to confessions — i.e., that because such statements carry criminal consequences, one ordinarily has no incentive to falsely confess one’s guilt — does not apply here. See Fed. R. Evid. 804(b)(3). Edmonds, already serving a life prison sentence, and free from a charge of perjury for his prior testimony, see footnote 19, supra, might well have thought that any statement he might make carried no consequences for him. Indeed, once he found out that real consequences might attach to his testimony, he refused to testify.
The majority, undaunted by Edmonds’s fickle history and the risk-free circumstances under which the affidavits were made, sees fit to conclude that Edmonds has finally told the truth. The majority’s willingness to accept Edmonds’s latest version of events is remarkable. The ma *842 jority’s treatment of Edmonds’s past statements is similarly troubling. When Edmonds’s testimony supports the majority’s views, it treats Edmonds as the embodiment of truth itself. Whenever his testimony does not mesh with the majority’s view of events, he is a pathological liar. For example, when Edmonds confessed his crime to a cellmate, “such statements by Edmonds lack credibility.”[25] Maj. Op. at 845. Similarly, the majority finds that Edmonds’s previous claims that his code name was “Low,” “should be viewed with skepticism.” Id. at 817.[26] On the other hand, Edmonds is to be fully credited when he “stated that prior to entering the house, there had never been any discussion between him and Smith about hitting anyone or using any kind of weapon on anyone,” id. at 820, never mind that “such statements by Edmonds [might] lack credibility,” id. at 815, or that Edmonds has given two other accounts of the evening where he and Smith discussed the possibility of using the crowbar against the occupants. The majority also credits Edmonds’s description of the hat Smith wore, Maj. Op. at 816, as well as his statements that he and Smith were in different parts of the dark house for much of the burglary, id. at 819-20 n. 20, even while concluding that “his initial testimony is necessarily false ... and lacks any force in countering the other available evidence,” id. at 817.[27]
But even if one were to ignore the affidavits’ troubling back story, they are both internally inconsistent and plainly inconsistent with each other. His first affidavit, from February 1996, states both that “Roger Smith did not kill Emmit Konzleman [sic]” and that Edmonds testified falsely out of his fear that “Roger Smith was about to testify and leave [Edmonds] to do a life sentence for a crime[Edmonds] did not commit.”[28] Yet both Edmonds and Smith agree that they and the Konzelmans were the only people to enter the Konzelman house that night, and it is clear that the Konzelmans did not attack themselves. There is no way to reconcile this affidavit — short as it is[29] — with reality.[30]
*843 Smith’s 2001 affidavit is a slight improvement over its predecessor, in that it is slightly longer and better organized and that it does not blatantly contradict itself. It explains his perjury as simply motivated by a desire to avoid prosecution for murder. While this differs markedly from what he said in his first affidavit,[31] it is certainly a more plausible reason. Nonetheless, this affidavit remains entirely undeserving of the weight the majority accords it. Entirely apart from the serious question of Edmonds’s honesty, there are also real issues as to his basis for making some of the statements in the affidavits, which consist entirely of bare, unsupported assertions.
Edmonds’s unexplained statement in his recent affidavits “that Mr. Smith never entered the Konzleman’sfsic] bedroom,” which the majority credits, see Maj. Op. at 820, provides an excellent example of both problems. Mrs. Konzelman’s testimony clearly refutes the affidavit in this respect: She testified that both burglars entered the bedroom for a short period of time.[32] At the same time, it is somehow undisputed that the two burglars were in the Konzelman residence for approximately forty minutes, and the majority states both that Smith and Edmonds did not “ke[ep] track of one another’s whereabouts while in the house,” id. at 819-20 n. 20, and that “the two men were in different parts of the house for most of the time,” id. at 819. Thus, it seems that not only did Edmonds lie in his affidavits, but that he lacked a basis for even making many of the statements contained therein.
Yet all of these issues- — -the internal inconsistencies, the unsupported assertions, and the contradictions with other facts in the record — could be fully addressed if Edmonds testified at an evidentiary hearing. Indeed, if Edmonds were given use immunity — like that which we have granted every other witness under the Westerdahl exception — there is good reason to believe that this is precisely what would happen. Further, Smith has not even asked for the extraordinary remedy that the majority confers.[33] I cannot agree with the majority’s decision to jettison an entire line of precedent by creating a new *844 remedy that is entirely alien to our case law and that does not suit the facts of this case.
C. Actual Innocence and the Schlup Gateway
Even indulging the majority’s presumption of truthfulness, Smith is not actually innocent. Not even close. As a legal matter, Edmonds’s affidavits, even if believed, completely fail to exculpate Smith of felony murder. In order to pass through Schlup’s “actual innocence” gateway, the “petitioner [must] show that ‘a constitutional violation has probably resulted in the conviction of one who is actually innocent.’ ” Schlup, 513 U.S. at 327, 115 S.Ct. 851 (quoting Murray v. Carrier, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). “To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.” Id. In determining whether the petitioner has carried his burden, courts consider all of the evidence, not just that which was presented at trial. Id. at 327-28. In doing so, however, courts must also consider the reliability of that evidence and augment or discount its probative value as may be appropriate. Id.[34]
In this case, the inquiry is more complicated than it would be ordinarily. Smith pled no contest to felony murder, because Emmett Konzelman was murdered in the course of Smith and Edmonds’s burglarizing the Konzelmans. Smith does not deny his involvement with the burglary. Instead, he rests his claim to innocence on Oregon’s affirmative defense to felony murder, which has five separate criteria that a defendant must satisfy. See Or. Rev. Stat. § 163.115(3) (2003).In Oregon, defendants bear the burden of proving affirmative defenses by a preponderance of the evidence. Id. § 161.055(2). Smith must therefore prove, by a preponderance of the evidence, that no reasonable juror would have found that he failed to meet each of these five criterion by a preponderance of the evidence. Or, put another way, Smith must show that it is more likely than not that every reasonable juror would find that Smith established every element of his affirmative defense. Or, rephrased a third time, Smith must show by a preponderance of the evidence that every juror who would find that Smith did not establish his affirmative defense was unreasonable. This is an extremely high burden to overcome: If a single reasonable juror could find that the evidence was in equipoise on any individual element of Smith’s affirmative defense, we must find for the state.
The elements of Oregon’s affirmative defense are not easy for a defendant to establish. A defendant must demonstrate that he:
(a) Was not the only participant in the underlying crime;
(b) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid in the commission thereof;
(c) Was not armed with a dangerous or deadly weapon;
(d) Had no reasonable ground to believe that any other participant was armed with a dangerous or deadly weapon; and
(e) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death.
*845 Id. § 163.115(3). The government concedes that Smith has satisfied element (a); however, each of the other four elements is contested.
Although I disagree with the majority on nearly every question presented in this case, I think there is at least one thing that is beyond dispute — it simply is not clear exactly what happened during the forty minutes that Smith and Edmonds were inside the Konzelman residence. Smith has never given a full account of what happened in this period, and Edmonds has given numerous contradicting accounts, each of which is marred by various biases. Elma Konzelman, the sole surviving, unbiased witness, was only conscious for a relatively small portion of the burglary, and her recollections are understandably somewhat hazy.
When one combines the vague and incomplete state of the evidence with the burden of proof imposed by Oregon’s affirmative defense to felony murder, which requires that Smith bear the burden of proof on multiple elements, and Schlup, which requires that a petitioner demonstrate that every juror who would find against him was unreasonable, it becomes clear that Smith cannot prevail. Thus, even if the majority was correct that the prosecution engaged in misconduct, Smith did not suffer any prejudice because, even if Edmonds were to testify consistently with his affidavits,[35] there is no way that Smith can satisfy the daunting burden created by Schlup and Oregon’s expansive felony murder statute. Even if one accepts the majority’s dubious remedy and accords Edmonds’s affidavits the presumption of truth, Smith has not carried his burden of proof on elements (c), (d), and (e).[36] I address each of these elements in turn.
1. Whether Smith “Was Not Armed with a Dangerous or Deadly Weapon”
The majority relies heavily on Edmonds’s recantations to conclude that Edmonds was the killer, not Smith. Based on this conclusion, the majority reasons that there is no evidence in the record to suggest that the other burglar — i.e., Smith — was armed at any point. Maj. Op. at 817-19. As I discuss below, this is simply not true. Yet even if it were true, Smith bears the burden of actually proving that he was not armed at any point; a lack of evidence is insufficient. If it was more likely than not that any reasonable juror could find that there was at least a fifty percent chance that Smith was armed at any point during the burglary, then the Schlup gateway is closed to Smith.
A reasonable juror might well have made such a finding here. A reasonable juror could have concluded that the two burglars conferred in the garage for some time on their method, and emerged from this conference with a clear consensus. *846 Both wore hats and similarly knotted bandannas to disguise their physical appearance. Both wore gloves to avoid leaving fingerprints inside the house. They procured these items together, with each taking items from both Edmonds’s truck and the Konzelmans’ garage. They established paired code names, “High” and “Low,” to further shield their identities. It hardly strains credulity to conclude that both decided to carry a weapon in the event that the residents should awaken while they were in the house.[37] Even if only one weapon was available (which was unlikely to be the case in a garage full of tools), the two might have debated who would carry the crowbar. If Smith picked it up first, or held it for a minute before giving it back to Edmonds, that brief possession would suffice.[38]
Then there is the rope. Smith’s trial attorneys both swore out affidavits stating that Smith admitted to carrying the rope into the Konzelman residence and Edmonds stated that they took it in case they should need to restrain their victims. Nothing in the record contradicts these assertions. Our legal reporters are replete with cases where criminals have used ropes as weapons. See, e.g., Schad v. Arizona, 501 U.S. 624, 627, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991); Sims v. Brown, 425 F.3d 560, 564 (9th Cir.2005); State v. Langley, 314 Or. 511, 840 P.2d 691, 695 (1992) (en banc).[39] Oregon’s statutory affirmative defense to felony murder requires a defendant to establish that he was not armed with any dangerous or deadly weapon; it is insufficient to establish that he was not carrying the murder weapon. Thus, even if a reasonable juror concluded that Smith never handled the crowbar, that juror may still conclude that Smith was armed with a dangerous weapon because he was carrying the rope.
The majority argues that it does not matter that Smith carried the rope because, the majority concludes, it is not a “dangerous weapon” under Oregon law.[40] Maj. Op. at 818. Oregon law defines a “dangerous weapon” as “any weapon, device, instrument, material or substance which under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or serious physical injury.” Or. Rev. Stat. § 161.015(1) (2003); Maj. Op. at 818. According to the majority, “[tjhere is no evidence suggesting that the rope in *847 this case qualified [as a dangerous or deadly weapon].” Id. at 818. This contention is absurd. Oregon courts have interpreted a “dangerous weapon” quite broadly. See, e.g., State v. Hill, 298 Or. 270, 692 P.2d 100 (1984) (en banc) (automobile); State v. Reed, 101 Or.App. 277, 790 P.2d 551 (1990) (concrete sidewalk); State v. Bell, 96 Or. App. 74, 771 P.2d 305 (1989) (cowboy boots); State v. Gale, 36 Or.App. 275, 583 P.2d 1169 (1978) (can opener); State v. Jacobs, 34 Or.App. 755, 579 P.2d 881 (1978) (hot water). When burglars attempt to tie up awakened victims in the middle of the night, the rope they use is certainly “readily capable of causing death or serious physical injury.” Cf. State v. Cornell, 314 Or. 673, 842 P.2d 394, 396, 402 (1992) (en banc) (upholding a felony murder conviction where victim died as a result of being bound by burglar). At one point, Edmonds testified that they took the rope so they could bind the occupants if they awoke. The majority ignores this evidence. But given that the victim in Cornell died when a rope was used as a restraint, a juror hearing testimony of this plan could reasonably conclude that the rope was a dangerous weapon, likely to cause death or serious physical injury if used in this way.
These are only a few of the logical paths that reasonable jurors might have taken. In this case, where so many details are unclear, it is impossible for Smith to meet the evidentiary burden that Schlup imposes. Yet the majority gives short shrift to the legal standards at issue, blithely brushing aside any concerns by relying on its questionable assumption that Edmonds was likely the killer.
2. Whether Smith “Had No Reasonable Ground to Believe That [Edmonds] Was Armed with a Dangerous or Deadly Weapon”
The majority’s analysis of whether Smith knew Edmonds was armed is no more satisfying than its determination that Smith was not armed. Based on the fact that the house was dark,[41] and the fact that Edmonds’s testimony as to when he and Smith entered the house was unclear, the majority concludes that every reasonable juror would likely conclude that Smith failed to notice that his companion was toting a three-foot-long crowbar. Maj. Op. at 819-20.
I cannot agree. It would have been difficult for Edmonds to conceal a three-foot-long crowbar, assuming he had wished to, and there is nothing in the record to suggest that Edmonds even attempted such a concealment.[42] As discussed previously, Smith and Edmonds were in the garage together for some time disguising themselves, assigning code names, and planning for contingencies before they entered the house. A reasonable juror could easily conclude that Smith saw the weapon then.[43]
*848 There is also plenty of evidence in the record to support a finding that Edmonds and Smith entered the house at or around the same time. The majority gives short shrift to one of Edmonds’s accounts of how they entered the house together and ignores others completely.[44] Even without this evidence, a jury could easily rely on Edmonds’s descriptions of how the two entered together after they disguised themselves together — strongly corroborated by the undisputed fact that Smith and Edmonds adopted similar disguises — and conclude that Edmonds and Smith entered together, which would have given Smith an excellent opportunity to notice the three-foot-long crowbar that the majority posits Edmonds was carrying. That conclusion, however, would be inconvenient to the majority’s case. Moreover, according to Smith’s attorneys, even though they told him what he would have to prove in order for his affirmative defense to succeed, Smith never told them that he did not know Edmonds was carrying the crowbar. Indeed, it was concern over precisely these issues that persuaded Smith’s two trial attorneys to forgo this affirmative defense and seek a plea bargain.
The majority’s inferences drawn from other “facts” fare no better. From Mrs. Konzelman’s statement that she was attacked by one person and Edmonds’s affidavit’s bald assertion that “Smith never entered the Konzleman’s[sic] bedroom,” the majority concludes that “Smith was not present when Edmonds struck Konzelman.” Maj. Op. at 820. This reasoning has several problems. First, Mrs. Konzelman’s testimony refutes Edmonds’s affidavit on this point. She testified that both burglars entered the bedroom for a short period of time. Second, nothing in Mrs. Konzelman’s statement is inconsistent with Smith being present when she was beaten.[45] Even ignoring the question of who *849 was actually doing the striking, the fact that there was a lone attacker does not prove that the second burglar was not present during the beatings. Although Mrs. Konzelman saw the second burglar walk away from the doorway, she was hit in the head with a crowbar directly afterward, at which point she, understandably, seems to have lost visual track of her surroundings as the first burglar continued beating Mr. Konzelman. It is entirely possible that the second burglar returned to the doorway while the beating was going on, or that he moved to a vantage point in the hallway from which he would not be visible to Mrs. Konzelman but could still see the attack.[46] Moreover, the second burglar need not have been present for the attack. All that is required is that he had reasonable grounds to believe that the first burglar was armed. Yet the majority concludes otherwise, adopting its own version of the facts as incontrovertible and ignoring all contrary evidence.
I have only scratched the surface of the broad realm of possible conclusions that a reasonable juror might have drawn. A reasonable juror easily could have credited Mrs. Konzelman’s testimony and concluded that Smith saw the crowbar while he was standing in the doorway of the Konzelmans’ bedroom and Edmonds was standing by the dresser, before the beating began.
Once again, the rope provides another sticking point for Smith’s case. Smith admitted to his attorneys that he took the rope into the Konzelmans’ home. The crowbar was found in the Konzelmans’ kitchen, and the rope was found on the floor of the bedroom. It is unlikely that the burglar carrying it would have abandoned the rope in the Konzelmans’ bedroom while they were asleep and untouched. Similarly, since the crowbar was found in the kitchen, the murderer had to continue carrying it after the beating. Thus, even assuming that Edmonds carried the crowbar and Smith the rope, the ultimate placement of both objects implies that Smith and Edmonds crossed paths while Edmonds had the crowbar and Smith the rope, or that Edmonds took the rope from Smith before the beating. In either event, it is strong evidence that, at some point during the course of the burglary,[47] Smith knew that Edmonds was carrying the crowbar.[48]
*850 Even a more modest hypothetical juror would recognize the implausibilities in the majority’s argument. Smith did not need to know that Edmonds was armed. It would suffice if Smith had reasonable grounds to believe that Edmonds was armed. This was almost certainly the case here. Recall again that Edmonds and Smith were in the garage together planning for some time before they entered the house. In the course of their discussion of disguises and code names and while Edmonds was rifling through the tools,[49] Edmonds may well have indicated his intent to carry a weapon inside with him, just in case. This knowledge alone would be enough to ruin Smith’s affirmative defense. Yet all of this is lost on the majority, whose opinion takes the most narrow conceivable view of what a juror might have found, completely flouting the Supreme Court’s holding in Schlup.
3. Whether Smith “Had No Reasonable Ground to Believe That [Edmonds] Intended to Engage in Conduct Likely to Result in Death”
The majority also makes short shrift of what reasonable jurors might infer about Smith’s knowledge the evening of the burglary.[50] While the fact that the burglars used disguises and code names could suggest that they did not intend to kill the Konzelmans, Maj. Op. at 819, the question is not whether the burglars originally intended to kill the Konzelmans. The question is whether Smith had reasonable grounds to believe that Edmonds intended to engage in potentially deadly conduct, and there is ample evidence to support such a finding. Indeed, a reasonable juror might well have found that Smith was put on notice as he stood in the bedroom doorway and saw that a visibly drug-addled Edmonds had turned on the lights and was waking up the Konzelmans. Even if one were to accept the majority’s highly contrived reasoning and conclude that Smith could not see any weapons as he looked into the room, the fact that Edmonds was intentionally arousing the house’s occupants was surely enough to put Smith on notice that extremely dangerous conduct — either outright violence from resisting victims, or the imposition of some form of dangerous restraint of the victims to keep them from seeking help — was likely to be forthcoming.[51]
*851 And yet again, our reasonable juror need not even go this far. As discussed earlier, a reasonable juror would very likely conclude that Smith brought the rope into the house with the contemplated purpose of using it to restrain the victims. Burglaries often involve potentially perilous circumstances.[52] Tying victims up is highly dangerous conduct that is likely to result in death — particularly in cases such as this one, where the victims are very elderly and are awakened unexpectedly by burglars in the middle of the night.
Indeed, there is Oregon case law directly on point. In State v. Cornell, 314 Or. 673, 842 P.2d 394, 396, 402 (1992) (en banc), a burglar tied up his victim and left; as a result, the victim died of asphyxiation. The defendant was convicted of felony murder, and the Oregon Supreme Court upheld the conviction.[53] Many other jurisdictions have upheld convictions under similar fact patterns. See also, e.g., Hill v. Norris, 96 F.3d 1085 (8th Cir.1996) (same); Cowan v. Artuz, 96 F.Supp.2d 298 (S.D.N.Y.2000) (upholding felony murder conviction after medical examiner testified that cause of death was “heart attack possibly caused by stress from being struck ... and bound”); United States ex rel. Brodie v. Hilton, 496 F.Supp. 619 (D.N.J. 1980) (upholding the felony murder conviction of a burglar whose victim was asphyxiated as a result of being bound); Cannistraci v. Smith, 470 F.Supp. 586 (S.D.N.Y.1979) (upholding a reckless murder conviction where victim was asphyxiated after being bound); State v. Molitor, 729 S.W.2d 551 (Mo.Ct.App.1987) (upholding felony murder conviction after victim was asphyxiated as a result of being bound). The majority suggests that a rope may not qualify as a deadly or dangerous weapon. While that may be true generally, the rope in this case does qualify. Edmonds and Smith were prepared to use the rope as a restraint. Given that the victim in Cornell died when so restrained, the inherent danger in such use of a rope is clear.
Summarizing all of the factual and legal conclusions that the majority would require every reasonable juror to draw demonstrates just how unreasonable their *852 construction of the evidence is. Every reasonable juror would have to conclude that the night’s events proceeded as follows: Smith and Edmonds, after deciding to burglarize the house to look for Mr. Konzelman’s wallet, returned to the garage together. They then disguised themselves and adopted code names. However, contrary to Edmonds’s prior testimony, they never discussed carrying a weapon in case the residents — whom they knew to be home — awakened. The two then entered the house, with Edmonds carrying a three-foot-long crowbar that Smith never touched. In fact, Smith not only didn’t touch it, he didn’t even have any reason to suspect that Edmonds was carrying a three-foot-long crowbar that Edmonds made no effort to conceal. Smith himself carried a rope he planned to use to tie up the victims if they awoke — an idea that, contrary to Edmonds’s testimony, he must have gotten on his own, since he and Edmonds never even contemplated what they would do if their victims woke up^ — but tying up resisting octogenarian victims who had been rudely awakened in the middle of the night and then leaving them there was not conduct likely to result in death. Smith and Edmonds then spent forty minutes burglarizing the Konzelmans’ residence, but even though Edmonds wasn’t keeping track of where Smith was or what he was doing during this entire time, Smith never had reason to believe that Edmonds was carrying a three-foot-long crowbar, or that he was contemplating any conduct that was likely to result in death. Smith then walked by the Konzelmans’ bedroom, where he saw that Edmonds, who had turned the bedroom light on, was standing at the foot of the Konzelmans’ bed and was waking them up. But this did not put Smith on notice that anything was amiss because Edmonds must have placed the crowbar on the ground at this point, so Smith didn’t see it, and he could not reasonably have foreseen any potential problems from the visibly drug-addled Edmonds waking the visibly geriatric Konzelmans in the course of the burglary. In fact, Smith felt so at ease that he decided to abandon the rope he was carrying right then and there, dropping it into the room without ever noticing the crowbar that was only a few feet away from it. Smith, confident that Edmonds and the Konzelmans would have a peaceful and harmonious discourse, then proceeded down the hall to resume burglarizing. He remained completely and blissfully unaware of what transpired in the bedroom until Edmonds had him pull the kitchen phone out of the wall (Edmonds himself was, at the same time, pulling the bedroom phone out of the wall). Smith then left the house without ever seeing the crowbar, which Edmonds must have tossed in the kitchen as he ran out of the house. Edmonds ran faster than Smith, though, since both Edmonds and Smith were able to make it back to Edmonds’s truck at the same time. Smith was as surprised as everyone else to learn that Mr. Konzelman had been murdered and Mrs. Konzelman had been assaulted.
Unfortunately for the people of Oregon, and fortunately for Smith, the majority does not even consider the inferences that a reasonable juror would likely draw. Instead, the majority engages in one-sided advocacy, cabining its analysis to narrowly limit the universe of findings that a reasonable juror might make. In doing so, the majority infers elaborate conclusions from the tiniest scraps of evidence, building narrow platforms that it leaps between in a complex game of judicial hopscotch. It is difficult enough to trace their path; I cannot join them in it.
*853 III. CONCLUSION
I vigorously disagree with the majority. I think that the majority finds a prima facie case of prosecutorial misconduct where there was none; I think that the majority should have addressed the prima facie case it concocted by remanding to the district court for an evidentiary hearing; and I think that the majority should not have deviated from our Westerdahl precedent by presuming Edmonds’s internally and mutually conflicting affidavits to be true instead of remanding for an evidentiary hearing with a grant of immunity. But I need not be right on every single one of these points to render my position correct and the majority’s erroneous. If I am correct on any single one of these issues, the majority has erred in its disposition of this case.
But most egregiously, even if we indulge in all of the majority’s legal innovations, the majority cannot escape the facts of this case. Smith is guilty of felony murder. He has no affirmative defense. The Schlup gateway is closed to him, and no amount of prying and tugging — not even with a crowbar and a rope — can get it open.
I respectfully dissent.

. There is some ambiguity in the record as to whether Mr. Bouse's first name is “Arlen” or "Marlin.” The district and magistrate judges *830 used the former, and the majority and the state court sentencing transcript use the latter. On this question, at least, I join the majority.

.Mrs. Konzelman believes that she was attacked because she protested when her husband was beaten. However, she stated that she based this opinion on speculation and that she didn't actually remember why the burglar decided to attack her. It is therefore entirely possible that she was attacked for a different reason, or — considering the methamphetamine induced state that both burglars were in at the time — that she was attacked for no reason at all.

. Contrary to the majority’s discussion of her observations, Maj. Op. at 816, Elma Konzelman would not have “fail[ed] to notice” what she could “see plainly.' ”

. The majority argues that “simply because black jeans were recovered from Smith's house and Mrs. Konzelman stated that the killer wore dark or black pants, it does not follow that Smith wore black jeans on the night of the burglary.” Maj. Op. at 816. The fact that officers found pants matching Mrs. Konzelmans description of what the killer was wearing in Smith's possession is undeniably inculpatory, particularly combined with the other evidence in tire record that Smith *831 wore jeans that night. Obviously, the fact that a defendant owns black pants is of limited probative value in and of itself, but just as a brick is not a wall, the majority’s assertion that "it does not follow that Smith wore black jeans on the night of the burglary” wholly misses the point.

. The tendency to fidget and the inability to sit still is a common symptom among methamphetamine users and addicts.

. Her early statements to police suggested that this might have been a truncated version of the word “hello,” but the record suggests that the two burglars referred to each other by the code names “High” and "Low” during the robbery.

. Not to mention the fact that she was seventy-four, she had just been awakened unexpectedly at four in the morning to watch her husband get beaten in the head with a crowbar, and she herself had just been hit in the head with that same crowbar.

. Nor, under the protections of the Fifth Amendment, is he in any way obligated to do so.

. I find that this assertion by the defense actually inculpates Smith. Mrs. Konzelman testified that she did not see gloves on the killer’s hands. Her testimony suggests that Smith wore only one brown glove, leaving Edmonds as the wearer of the latex gloves. This evidence is made more incriminating by the fact that the work glove had a small blood stain on its palm. Even though the stain was too small to permit blood typing, the presence of blood suggests that it may have been worn by the killer. The matching glove was found in the Konzelmans’ garage. In light of the attention that the majority gives to the rest of Smith and Edmonds’s attire, Maj. Op. at 816-17, I find it strange that they ignore this piece of evidence.

. In Oregon, felony murder and murder are codified under the same statute, Or. Rev. Stat. § 163.115 (2003), but felony murder was clearly the theory under which Smith was charged and prosecuted in this case.

. The majority acknowledges that there is evidence corroborating Edmonds's initial accounts of the burglaiy, but finds that the corroborated elements "are irrelevant to the question [of] whether he or Smith committed the murder.” Maj. Op. at 815. This is not true. Edmonds stated that the Konzelmans woke up because Smith turned on the bedroom lights, which conforms with Mrs. Konzelman’s version of events. Edmonds testified that he was standing in the bedroom doorway behind Smith when Smith stepped into the room and turned on the lights. This positioning matches Mrs. Konzelman's testimony that before the beating she saw one burglar in her room by the dresser and another in the doorway. Edmonds testified that Mr. Konzelman started to rouse, and Smith told him to "Lay back down, old man,” before making a threatening gesture with the crowbar, at which point Edmonds left. This sequence of events synchronizes with Mrs. Konzelman’s description almost exactly, including that the second burglar was only in the doorway for a short period of time before walking away. In Mrs. Konzelman's testimony, the only other evidence that has been presented *833 about the murder, there is actually significant corroboration for Edmonds's testimony.

. When officers informed Edmonds that his ticket stub had been found at the scene of the homicide, he put his head down on the interrogation table and started to cry.

. The majority states that such a claim would not be subject to procedural default. See Maj. Op. at 810 n. 4. But it is not at all clear from Herrera that this is the case. The Herrera Court only assumed that establishing substantive actual innocence in a capital case "would ... warrant federal habeas relief if there were no state avenue open to process such a claim." Heirera, 506 U.S. at 417, 113 S.Ct. 853 (emphasis added). Thus, so long as a *835 habeas petitioner has a state forum in which he could have his actual innocence claim heard, but eschews it in favor of federal review, we would still be barred from adjudicating it on the merits because of the petitioner’s procedural default.

. Technically, in our Westerdahl cases, the state is not compelled to offer use immunity. However, if the state declines to do so, the court enters a judgment of acquittal for the defendant.

. As these cases make clear, Webb's rule has been extended to apply to prosecutors as well as judges.

. The majority notes that appointed counsel was likely to advise Edmonds of the risks of testifying. While the majority's cynical reading that appointed counsel was "a necessary preliminary step to Edmonds's execution,” Maj. Op. at 823-24 n. 28, one cannot seriously question the benefits of acting with counseled advice.

. Although I rely on this evidence to evaluate the lessened deterrent force of potential punishment, I do not use the conviction, as the majority does, as propensity evidence to suggest that it indicates Edmonds was more likely to have been the Konzelmans' killer. See Maj. Op. at 814 n.8. The majority misreads Schlup as definitively allowing this inadmissible evidence.
It is a well-established proposition that Fed. R. Evid 404(b) strictly forbids propensity evidence as improper because its prejudicial effect out-weighs its probative value. See Old Chief v. United States, 519 U.S. 172, 180-82, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). This evidence and the majority's unqualified inference is no more acceptable under the Schlup inquiry than it would be in court. The majority interprets Schlup as providing that "[ujnder AEDPA, we may consider such evidence on habeas review without regard to the rules of admissibility that would govern at a trial.” Maj. Op. at 814 n. 8 (referring to Schlup, 513 U.S. at 327-28, 115 S.Ct. 851). It is true that Schlup notes that a reviewing court "is not bound by the rules of admissibility that would govern at trial.” 513 U.S. at 327, 115 S.Ct. 851. That is, a court may consider "relevant evidence that was either excluded or unavailable at trial.” 513 U.S. at 327-28, 115 S.Ct. 851. Such evidence, the Court explains, includes "that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.” Id. (citation omitted); see also House v. Bell,-U.S. -,-, 126 S.Ct. 2064, 2077, 165 L.Ed.2d 1 (2006) (characterizing Schlup as allowing for review of "old and new, incriminating and exculpatory” evidence).
But it is not clear that Schlup allows for consideration of all inadmissible evidence. Schlup and its progeny emphasize that a reviewing court need not make reliability or credibility determinations in assessing whether a petitioner passes through the Schlup actual innocence gateway. See Schlup, 513 U.S. at 331, 115 S.Ct. 851 (noting that the new evidence was potentially unreliable). Instead, reviewing courts may assume the truthfulness of new evidence in assessing whether no juror would find a petitioner guilty beyond a reasonable doubt. See id. (assuming statements to be true and then evaluating whether a juror hearing such evidence would vote to convict).
At no point has the Supreme Court provided for evaluation of flatly and notoriously inadmissible evidence like the propensity evidence discussed by the majority. While Schlup frees a reviewing court from admissibility considerations such as assessing reliability and weighing credibility, Schlup does not permit us to consider evidence that is inadmissible independent of such considerations.

. By the same token, Edmonds may have reasoned that, since he would be spending the rest of his life behind bars, he ought to acknowledge his true role in the murder of Emmett Konzelman and thereby exonerate the wrongfully convicted Smith. Indeed, this is Smith’s theory. But the alternate posited motivation is at least as plausible, and the prosecutor cannot be faulted for refusing to accept Edmonds’s questionable new testimony at face value.

. A perjury charge for Edmonds's testimony at Smith’s sentencing was barred by the statute of limitations. The record indicates that the prosecution was concerned that Smith's defense attorney might have told Edmonds this, but neglected to tell him that his plea agreement could be set aside and that he could be prosecuted for capital murder.

. I note that, under Oregon law, there is no statute of limitations for either murder or manslaughter. Or. Rev. Stat. § 131.125(1) (2003).

. While the death penalty is of course the most severe punishment a defendant can receive, nothing in the majority’s logic is limited to cases involving capital punishment. The spectre of a life sentence is still a highly coercive punishment that could have nearly as strong an effect on a defendant's behavior, and the same logic would apply to any long prison sentence. Indeed, the defense witness who was granted immunity in 'Westerdahl faced a conviction for robbery which carried a potential sentence of at least twenty years. See Westerdahl, 945 F.2d at 1085; United *841 States v. Westerdahl, 727 F.Supp. 1364, 1365 (D.Or.1989).

. Although the majority settles on what it terms "the least intrusive” of the three remedies it invents, Maj. Op. at 827, one cannot ignore the utter obtrusiveness of all of the alternatives. Indeed, the majority’s analysis is like comparing a wrecking ball to a bulldozer and settling on the latter to avoid some of the dust.

. The majority does limit its opinion by only adopting the presumption of truthfulness for the purposes of the Schlup actual innocence gateway. See, e.g., Maj. Op. at 807 ("We deem the exculpatory statements to be truthful ... only for the purpose of determining whether Smith’s contentions are sufficient to excuse any procedural default that may have occurred.”); id. at 814 ("[W]e presume Edmonds’s affidavits to be true for purposes of determining whether Smith is procedurally barred from prosecuting in federal court.”); id. at 827 (adopting the remedy that "presum[es] Edmonds's recantations to be true for the limited purpose of determining whether Smith may pass through the Schlup gateway”); id. at 828 (”[W]e ... hold[] merely that Edmonds's affidavits must be presumed to be true for purposes of the Schlup inquiry.”). Yet the fact that the majority’s rule is limited to the Schlup inquiry is not particularly reassuring. Prisoners in our circuit file numerous claims under Schlup each year. Many prisoners will likely try to contort the facts of their cases so as to fit the majority's narrow, but wholly unwarranted, expansion of our case law.

.She was originally indicted as a result. Ultimately, she was not prosecuted after it was discovered that she had not been in the truck and was not involved in the Konzelman burglary. The government did pursue charges against her for hindering prosecution, but these were dropped as part of Smith's plea agreement.

. The majority's full statement begins “Particularly in light of his recantations, such statements by Edmonds lack credibility.” Id. at 815. Of course, this begs the question of which of his statements, if any, is true. A jury might just as easily conclude that "Particularly in light of such statements by Edmonds, his recantations lack credibility.”

. The majority also concludes that, because of Edmonds's subsequent inability to remember the specifics of the code, the "evidence regarding the use of code names appears inconclusive.” Id. at 817. But elsewhere, the majority concludes that the burglars did use code names and uses that fact to infer that they did not intend to kill the Konzelmans at the outset. Id. at 819.

. Contrary to the majority's claims, I do not argue that "we must either afford full credibility to [Edmonds's] testimony or none at all,” and I do not dispute that "any factfinder would ... choose the elements of his story that it found credible and those that it did not.” Maj. Op. at 817 n. 16. But the majority resolves every ambiguity in Edmonds’s testimony by concluding that a jury would choose the reading that most favors Smith. This is, at best, a highly dubious practice.

. The majority suggests that “this confusing statement could have resulted either from Edmonds's characterization of his defense attorney's advice or the fact that he swore out his first affidavit without the benefit of an attorney’s supervision to help him clarify his statements.” Maj. Op. at 814-15 n. 9. It strains credulity to suggest that Edmonds thought that he was innocent of murdering the Konzelmans because of "his defense attorney’s advice.” The suggestion that Edmonds thought that he was innocent because he wrote the affidavit "without the benefit of an attorney's supervision” is equally absurd.

. Edmonds's 1996 affidavit is only a few lines long, and essentially says only three things. It contains the two, conflicting statements previously discussed, and a third state *843 ment that further impeaches Edmonds's credibility. This statement is the assertion that Edmonds committed perjury "with full knowledge of the consequences.” Thus, when the majority refers to the "unequivocal nature of every other statement relating to guilt in the affidavit,” Maj. Op. at 814-15 n. 9, it is relying on a remarkably small amount of text.

. As a matter of formal logic, I must admit to being somewhat baffled by how the majority manages to accord a presumption of truth to two conflicting statements.

. In the 1996 affidavit, he states that his perjury was motivated by a fear that he would be unjustly convicted of a crime that he did not commit, while the 2001 affidavit identifies a more mercenary desire to limit the term of his incarceration.

. It is possible to reconcile these two statements if Mrs. Konzelman considered the burglar standing in her bedroom doorway to be standing in her bedroom and Edmonds considered this to be standing outside the bedroom. This is a highly charitable reading of Edmonds's testimony, however. Moreover, as discussed later in my dissent, Smith has admitted to carrying a rope into the house from the Konzelmans' garage. This rope was found by police on the floor of the bedroom. This provides a strong independent basis, apart from Mrs. Konzelman's testimony, from which to conclude that Smith entered the Konzelman bedroom.

. The majority argues that its remedy is not extraordinary, Maj. Op. at 828, but I would say that according a presumption which we have never before accorded — in any context-— to an area where our cases have clearly established that a particular remedy should be applied is, by definition, extraordinary.

. As the majority notes, see Maj. Op. at 813, the Supreme Court's recent decision in House v. Bell, — U.S. -, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006), establishes that the Schlup actual innocence gateway survives AEDPA.

. Referring to the second affidavit, the majority states that “Edmonds's declaration even more strongly inculpated himself and exculpated Smith as the actual killer.” Maj. Op. at 809. But because Smith was convicted of felony murder it makes no difference whether or not he actually killed Mrs. Konzelman. The affidavit says nothing about the three contested elements of Oregon’s felony murder affirmative defense, and if he cannot establish any one of those elements, Smith’s claim of actual innocence fails.

. If we do not presume Edmonds’s affidavits to be true, it is even clearer that these elements have not been met. For example, a juror might find that Edmonds’s story has changed so drastically in each retelling that nothing he said was credible. That juror could rely on Elma Konzelman’s testimony to infer that the two burglars were near each other in the lighted bedroom and that, even if Edmonds had committed the murder, Smith could not establish that he had not seen Edmonds carrying the crowbar.

. The police found knives next to the single brown bloodstained work glove outside the Konzelmans' residence. At least one of those knives was established to have come from the Konzelmans’ garage. As Smith argues on appeal that he wore a single brown work glove, a reasonable juror could easily find that Smith carried a knife during the burglary.

. It is also worth noting that, even after their evidentiary value has been unduly magnified by the presumption of truth that the majority grants them, Edmonds's affidavits provide no direct insight as to whether Smith was armed at any point.

. I note also that this perception is hardly limited to the legal world. For example, the popular board game Clue features a rope as one of the possible murder weapons. The others are the revolver, the lead pipe, the wrench, the candlestick, and the knife. See also ROPE (Alfred Hitchcock 1948).

.The majority argues that I have "creativefiy]” “concocted [the rope argument] out of whole hemp,” and that the state does not raise this argument. Maj. Op. at 818. Since Smith bears the burden of proving that he was not armed, it seems entirely appropriate to rely on the undisputed fact that he carried the rope in assessing whether he has met that burden, regardless of whether the state has raised this issue. As for creativity, my own imagination pales in comparison to the majority's — its opinion draws sweeping, astounding conclusions from the tiniest scraps of evidence and applies an unrequested, never-before-seen remedy.

. The majority neglects to mention that the burglars had no visibility problems while they were picking through the Konzelmans' garage. The record suggests that this was because they each carried and used a light source: Edmonds and Bouse each had a lighter and Smith had a flashlight.

. Edmonds's affidavits do not say anything about Smith's knowledge of the presence of the crowbar.

.The majority attempts to downplay this possibility, emphasizing that the burglary was "haphazard and unplanned” because "the burglars ran in and out of the house due to unexpected noises and left several items behind, including Mr. Konzelman's money and wallet.” Maj. Op. at 819. It is undisputed that a loud noise initially drove the burglars out of the garage. Indeed, it was after they fled that they decided to return and burglarize the interior of the house instead of merely the garage. At that point, they returned to the *848 garage, disguised themselves, established code names and obtained a weapon. Thus, the fact that they initially fled only serves to undermine the majority's position instead of supporting it. As for Mr. Konzelman's money and wallet, the record does not suggest that the burglars abandoned it in their haste to flee, but that they never found it. In any event, their treatment of the wallet sheds little light either on the discussion the two burglars had in the Konzelmans' garage or on the question of how likely Smith would have been to see a crowbar in Edmonds’s hand.

. There is plenty of evidence from which a jury could conclude that the burglars entered the house together. Consider, for example, this excerpt from a statement that Edmonds gave to police:
[A]t that point we go in there and uh, we’re standing by the garage and I figure, before we get [the wallet from inside the house], just in case they wake up, and we have to run, that we mask ourselves, uh, put hats on and I noticed that there was two hats hanging on hooks in the garage so, we grabbed those and we put them on and we masked ourselves with bandanas and uh, we went in the house....
Or consider this transcript of police questioning Edmonds:
Police: Okay, alright, and then you entered the house?
Edmonds: Yes.
P: You’re in the living room?
E: Yes.
P: Is Roger [Smith] with you then?
E: Uh, yeah.
Or consider Edmonds's testimony at Smith's sentencing proceedings:
Prosecutor: Who went into the house first?
Edmonds: I did.
P: Did you see Mr. Smith come into the house?
E: Yeah.
P: How long had you been in the house when Mr.
Smith came inside the house?
E: Ah, I don't know. He came in probably right behind me.

. Yet, when it fulfills other needs, the majority finds that "the state could subpoena [Smith] and compel him to testify, truthfully, that Edmonds ... was the killer.” Id. at 826 n. 33. The majority does not explain how *849 Smith could not have been present, but could "testify!] truthfully” that Edmonds killed Mr. Konzelman. If the majority merely means that Smith can testify that he did not kill the Konzelmans, it is not at all clear why the jury would credit his view over contrary testimony from Edmonds. Of course, if Smith had seen Edmonds kill Konzelman, he would have to have seen the crowbar, which would completely foreclose his affirmative defense to felony murder.

. This also casts doubt on the majority's suggestion that "the details about the actual murder that Edmonds was able to provide could best be explained by the fact that he was the attacker.” Maj. Op. at 815 n. 11.

. The Oregon statute does not specify when during the course of the crime a defendant must be aware that his accomplices are armed. There is good reason to conclude that a defendant who persists in the felony after discovering that his co-felon is armed is precluded from succeeding under Oregon's affirmative defense, even if the murder has already been committed at that point. The same underlying inferences regarding a defendant’s mental culpability that animate this element of the affirmative defense — that the defendant persists in committing a felony despite the fact that the presence of an armed criminal greatly increases the risks that victims face — applies equally well before and after the beating in this case, since a second victim (Mrs. Konzelman) was still alive and vulnerable. Mrs. Konzelman also testified that the burglars continued to ransack her home after the attack.

. The majority's conclusion that "Smith likely dropped the rope when he paused briefly in the bedroom doorway and before he continued on down the hall” — a conclusion based solely on the fact that “the rope was found just to the 'left of the bedroom door' ” —is speculation of the highest order. Maj. Op. at 817-18 n. 17. There is absolutely nothing in the record that would suggest that Smith dropped the rope when the majority posits that he did. The majority cannot even provide a reason why Smith would have dropped the rope at that point. A reasonable juror could easily draw a multitude of very different conclusions from this evidence.

. A chainsaw from the Konzelmans' garage was among the items that Edmonds stole and brought back to his truck.

.The majority mischaracterizes the district court’s consideration of this issue. The majority states that "The district court never found that Edmonds and Smith planned to engage in any violent conduct or even discussed doing so.” Maj. Op. at 820. In fact, the district court did not reach the question of whether Smith and Edmonds had explicitly planned to engage in violent conduct or discussed that possibility because it concluded that the nighttime burglary of a home that they knew was occupied was sufficiently dangerous conduct to foreclose the affirmative defense. To imply that the district court considered whether Edmonds and Smith "planned to engage in any violent conduct,” or would have needed to, is highly misleading.

. The majority states that "Edmonds himself stated that prior to entering the house, there had never been any discussion between him and Smith about hitting anyone or using any kind of weapon on anyone.” Maj. Op. at 820. The record demonstrates that Edmonds has stated the exact opposite multiple times, a fact which the majority ignores. Edmonds also testified at Smith’s sentencing hearing that they took the rope so they could bind the occupants if they awoke.

. The majority relies on Enmund v. Florida, 458 U.S. 782, 799-800, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) for statistics to dispute that a "generic residential robbery is likely to result in death.” Maj. Op. at 821 & n. 23. But while Supreme Court opinions are binding precedent for their legal holdings, they are not so for their statistical references.
Even if, as the majority argues, the Enmund statistics are still valid today, the occurrence of homicide during a robbery is not a sufficiently refined measure of whether any given activity is likely to result in death. Smith and Edmonds discussed tying up any occupants of the house. They anticipated that their planned burglary might turn confrontational. Certainly the likelihood of serious injury or death occurring under these circumstances may be greater than average. See http:// www.fbi.gov/ucr/ 05cius/index.html (providing definitions and reporting statistics).

.The majority's statement that "there [we]re no plans to engage in violent conduct and, to Smith's knowledge, no weapons on hand with which to do so” is patently false. Maj. Op. at 821. The record is clear that the burglars were contemplating tying up the house's residents. This would clearly be violent conduct. As I have discussed earlier, the rope itself was a weapon.